IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


DARLENE SUE GARDNER,

        Plaintiff,

vs.                                        Case No. 14-4048-SAC

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

        Defendant.


**MEMORANDUM AND ORDER**

On October 6, 2010, plaintiff filed applications for social security disability insurance benefits and supplemental security income benefits. These applications alleged a disability onset date of November 26, 2007. On October 25, 2012, a hearing was conducted upon plaintiff's applications. The administrative law judge (ALJ) considered the evidence and decided on December 4, 2012 that plaintiff was not qualified to receive benefits. This decision has been adopted by defendant. This case is now before the court upon plaintiff's action to reverse and remand the decision to deny plaintiff's applications for benefits. Plaintiff argues that she meets the requirements for benefits under § 12.05C of the Listing of Impairments which concerns subaverage intellectual functioning and deficits in adaptive functioning. She also argues that the ALJ did not correctly

1

assess her residual functional capacity.   For the reasons discussed below, the court shall reverse the decision to deny benefits and remand for an award of benefits on the basis of plaintiff's § 12.05C argument.

I.  STANDARD OF REVIEW

       To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program. See Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131.   To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

       For supplemental security income claims, a claimant becomes eligible in the first month where he or she is both disabled and has an application on file.  20 C.F.R. §§ 416.202-03, 416.330, 416.335.

       The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards.  Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004).  "Substantial evidence" is "more than a mere scintilla;"

2

it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id., quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)). The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II. THE ALJ'S DECISION (Tr. 19-32).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision. (Tr. 20-21). First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart

P, Appendix 1.  Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work.  Finally, at the last step of the sequential evaluation process, the ALJ determines whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.

In steps one through four the burden is on the claimant to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006).  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy with the claimant's residual functional capacity.  Id.  In this case, the ALJ decided plaintiff's application should be denied at the fifth step of the evaluation process.

The ALJ made the following specific findings in his decision.  First, plaintiff meets the insured status requirements for Social Security benefits through September 30, 2012.  Second, plaintiff did not engage in substantial gainful activity since November 26, 2007, the alleged onset date of disability.  Plaintiff worked as a housekeeper after that date, but her earnings were such that the ALJ did not consider it substantial gainful activity. Third, plaintiff has the following

4

severe impairments: incisional hernia status post-repair; obesity; depression and borderline intellectual functioning. Fourth, plaintiff does not have an impairment or combination of impairments that meet or medically equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Fifth, plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) in that plaintiff can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. The ALJ further found that plaintiff is capable of sitting for up to 6 hours and standing and walking for six hours in an 8-hour workday with normal breaks. The ALJ also concluded that plaintiff is limited to simple, routine, and repetitive tasks and also limited to work involving only simple, work-related decisions, with few, if any workplace changes. Finally, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. Examples of such occupations, according to the ALJ, are housekeeper, folder of laundry, and bakery worker.

III. EVIDENCE

The arguments in this case focus upon evidence from three sources.

A.   <u>Dr. Mintz</u>

One of those sources is a mental status examination performed on January 7, 2010 by Dr. Stanley Mintz.  (Tr. 346-348).   He noted that plaintiff did not appear psychotic, depressed, anxious, phobic or obsessive/compulsive.  Also, there were no reports of hallucinations or delusions.  Plaintiff's speech was intelligible.  She appeared pleasant.  Dr. Mintz concluded that plaintiff was able to understand only very simple instructions.  Her concentration was limited for very repetitive tasks.  She did not appear capable of handling her own funds because of symptoms of "mental retardation."  (Tr. 347).

With regard to adaptive levels of functioning, Dr. Mintz concluded that plaintiff had difficulty "with receptive and expressive communication, self direction and self help, and vocational functioning."  <u>Id.</u>  Dr. Mintz found that plaintiff functioned within the borderline intellectual range.  Her full-scale IQ score was 66; her verbal IQ score was 65; and her performance IQ score was 74.  He concluded that plaintiff's scores placed her within the "mild mentally retarded range of verbal intellectual ability" and "within the borderline range of perceptual motor intellectual ability."  <u>Id.</u>  He diagnosed plaintiff with "mild mental retardation" and he estimated a GAF score of 60.  (Tr. 348).

Plaintiff told Dr. Mintz that she lived with her brother and the land lady; that she could dress and bathe herself; and that she could pick out items in the store, but that she did not know how to make change.   Plaintiff said that she could cook simple dishes, do child care and laundry, and watch television.

B.   Dr. Suansillppongse

On June 23, 2011, Dr. Aroon Suansillppongse completed a Psychiatric Review Technique form regarding plaintiff.   He did not examine plaintiff.   This is a check-the-box form.   Dr. Suansillppongse recorded that plaintiff had mild restrictions upon her activities of daily living and mild difficulties in maintaining social functioning. (Tr. 322).   He further recorded that plaintiff had moderate difficulties in maintaining concentration, persistence or pace.   Id.   Dr. Suansillppongse found that plaintiff was moderately limited in the following areas:   the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions  and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others.   (Tr. 325-26).   Otherwise, plaintiff

7

was listed as not significantly limited in the mental activities
listed on the form.  Id.  Dr. Suansillppongse wrote:

> The claimant is able to understand and remember simple
> instructions.  She is able to carry out simple
> instructions.  Her ability for sustained concentration
> and persistence or for task completion would be
> minimally limited due to inherently limited cognitive
> functioning.  Her ability for appropriate interaction
> with supervisors, coworkers or the public would not be
> significantly limited.  Her adaptability in a routine
> work setting would be minimally limited due to
> inherently limited cognitive functioning.
>
> The psychiatric impairment severity does not meet or
> equal any Listing.  The claimant has mental capacity
> for simple work related activity.  Diagnosis:
> **Borderline Intellectual Functioning r/o Learning
> Disorder NOS.**

(Tr. 327).  He also noted that there was no evidence of
plaintiff's IQ scores prior to age 22.  He concluded that based
upon plaintiff's past adaptive functioning, her IQ scores "are
estimated to be in the range of borderline intellectual
functioning, if not higher."  (Tr. 324).

    C.  Plaintiff's testimony

    Plaintiff testified that she had a high school diploma, but
that she was in special education classes from third grade to
her senior year and that she spent most of the day in such
classes.  (Tr. 44).  When asked if she could read and write,
plaintiff responded that she could read, but she could not
comprehend what she read.  She said that she cannot comprehend
what she is told to do on jobs and has to ask over and over

8

again.   (Tr. 46).   Plaintiff said that she can't do math and can't count change.   (Tr. 51).   When she shops for groceries, she has a friend who keeps track of what plaintiff spends.   (Tr. 49).

Plaintiff does not have the internet, but she plays some computer games.   Id.   She also watches television shows like CSI and Price is Right.   Id.   She is able to follow along.   (Tr. 50).

Plaintiff testified that she was terminated from her last job as a housekeeper because she was too slow.   (Tr. 45).   She also related that she has only lived alone for two months during her adult life.   (Tr. 48).   Plaintiff has two children, but her parental rights were terminated in 2009.   (Tr. 51).   According to plaintiff, she was not able to care for the children, so the State took them.   (Tr. 51-52).

IV.   PLAINTIFF DEMONSTRATED THAT SHE HAD A LISTED IMPAIRMENT UNDER § 12.05C.

Plaintiff's first argument to reverse the decision to deny benefits is that the ALJ erred in determining that plaintiff did not meet the requirements of § 12.05C of the Listing of Impairments.   During the administrative process, plaintiff had the burden of showing that her impairment was equivalent to a listed impairment.   See Lax, 489 F.3d at 1084.

A.   <u>Section 12.05C requirements</u>.

Section 12.05C provides that a person will be considered disabled and entitled to benefits if he or she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onsets of the impairment before age 22" as manifested by "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.

To add some meaning to the term "adaptive functioning" the court refers to the following sources.  According to the Listing of Impairments regulations, "adaptive activities" include such activities as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, grooming and hygiene, using telephones and directories, and using a post office."  §12.00(C)(1).  The Second Circuit has said that "adaptive functioning" refers to "an individual's ability to cope with the challenges of ordinary everyday life."  <u>Talavera v. Astrue</u>, 697 F.3d 145, 153 (2nd Cir. 2012)(interior quotation omitted).  Thus, "if one is able to satisfactorily navigate activities such as living on one's own, taking care of children without help sufficiently well that they have not been adjudged

10

neglected, paying bills, and avoiding eviction, one does not suffer from deficits in adaptive functioning." Id. (interior quotation omitted). Another judge in this district has described a "loss in adaptive functioning" as "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, and pace." Hayes v. Colvin, 2014 WL 6609380 *3 (D.Kan. 11/20/2014); see also § 12.00C(4)(using the same language). Another court has quoted the Diagnostic and Statistical Manual of Mental Disorders 38 (5th ed. 2013)("DSM-IV") to hold that "[a] person demonstrates deficits in adaptive functioning consistent with intellectual disability 'when at least one domain of adaptive functioning . . . is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community.'" Davis v. Colvin, 2015 WL 3504984 *4 (M.D.Tenn. 5/28/2015).

The purpose of § 12.05C "'is to compensate a claimant with an IQ in the 60-70 range and a limitation of function that affects his work.'" Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997)(quoting Sird v. Chater, 401, 403 n.6 (8th Cir. 1997)). In Gross v. Astrue, 2012 WL 2449900 *8 (D.Kan. 6/26/2012), the court further elaborated upon the intent of § 12.05C:

> Listing 12.05C expresses the understanding that
> certain mildly mentally retarded individuals will be
> unable to work because they also have 'a physical or
> other mental impairment imposing an additional and
> significant work-related limitation of function.' 20
> C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C). This
> listing implies that such an individual will be able
> to work unless he has, or until he develops, a severe
> physical impairment or an additional severe mental
> impairment.

A "significant work-related limitation of function," according to the Tenth Circuit, is a severe physical or other mental impairment as defined at step two of the five-step disability analysis. Hinkle, supra.

B. The ALJ's reasons for rejecting plaintiff's claims under § 12.05C are not supported by the law or substantial evidence.

The ALJ determined that plaintiff did not meet the requirements of § 12.05C because the evidence "as a whole indicates the [plaintiff] has no deficits in adaptive functioning." (Tr. 25). He also concluded that the record did not support that plaintiff had deficits in adaptive functioning prior to age 22. Id. Finally, he emphasized that, although Dr. Mintz tested plaintiff and found verbal and full scale IQ scores between 60 and 70, Dr. Suansilppongse determined that plaintiff's functional abilities as a whole placed plaintiff within the borderline intellectual functioning range. Id.

The court agrees with plaintiff that the ALJ's reasons for rejecting plaintiff's claim under § 12.05C are not supported by

12

the law or substantial evidence in the factual record and,
therefore, the decision to deny benefits must be reversed.

    1.  <u>Plaintiff demonstrated an IQ test score which
meets the § 12.05C requirement.</u>

The court shall make note first of what the ALJ did <u>not</u>
argue.  The ALJ did not expressly argue or find that Dr. Mintz's
IQ tests of plaintiff were flawed or invalid.   The ALJ
contrasted the scores on those tests with Dr. Suansilppongse's
conclusion that plaintiff's functional abilities, as a whole,
placed plaintiff within the borderline intellectual functioning
range.  (Tr. 25).  This conclusion accords with Dr. Mintz's
report where he states that plaintiff "functions within the
borderline intellectual range."  (Tr. 347).  These findings,
however, do not rebut the clear evidence in the record that
plaintiff has IQ test scores between 60 and 70 in satisfaction
of one of the requirements of § 12.05C.[1]

Other court decisions have held that evidence of
"borderline intellectual functioning" does not preclude a
holding that § 12.05C's IQ score requirement was satisfied.
<u>Turnage v. Astrue</u>, 2012 WL 405590 *6 (D.Kan. 2/8/2012); <u>Bradley
v. Astrue</u>, 2012 WL 5878612 *8 (D.Kan. 11/21/2012); <u>Devoe v.
Barnhart</u>, 2006 WL 1272614 *6 (D.Conn. 3/15/2006); <u>Bishop v.
Barnhart</u>, 2005 WL 946560 *3 (D.Kan. 3/15/2005); see also, <u>Brown

---

[1] The lowest valid IQ score is used for the purposes of § 12.05.  §
12.00D(6)(c); <u>Hinkle</u>, 132 F.3d at 1351.

v. Sec'y of HHS, 948 F.2d 268, 270 (6th Cir. 1991)(work history as truck driver, ability to make change, do laundry and clean room is not inconsistent with IQ score of 68). Here, if the ALJ meant to contend that Dr. Mintz's IQ testing was invalid, he could have easily said so.   Therefore, the court construes the ALJ's reference to Dr. Suansilppongse's assessment of plaintiff's intellectual abilities, not as an attack upon Dr. Mintz's IQ test findings, but as an argument relating to plaintiff's adaptive functioning.   The court will address that argument later in this opinion.

  2. <u>The ALJ found that plaintiff has a significant physical or other mental impairment</u>.

 The ALJ found that plaintiff had, in the words of § 12.05C, "a physical or other mental impairment imposing additional and significant work-related limitation of function."   At step two, the ALJ determined that plaintiff had severe impairments such as incisional hernia status post-repair, obesity and depression. (Tr. 22).   As noted earlier, under these circumstances the <u>Hinkle</u> case holds that the § 12.05C requirement of a physical or mental impairment in addition to plaintiff's intellectual disability is satisfied by plaintiff.

  3. <u>Plaintiff has demonstrated deficits in her adaptive functioning</u>.

 The crux of the ALJ's findings regarding § 12.05C appear to be that plaintiff failed to demonstrate sufficient deficits in

her adaptive functioning and failed to demonstrate that these deficits and her intellectual disability existed prior to age 22. To support the first part of this argument, the ALJ emphasized what plaintiff can do, but did not directly dispute the evidence of what plaintiff cannot do. The ALJ found that plaintiff can read; that she can follow along with the TV shows she watches; that she can go shopping with assistance; that she can perform personal care; and that she can cook, clean the kitchen, wash dishes and do laundry. He further noted that once in May 2012, when plaintiff was released from a hospital emergency room, a nurse remarked that there were "no learning barriers present." (Tr. 25 referring to Tr. 340). In addition, the ALJ mentioned plaintiff's comment that she can pay attention "all the time." (Tr. 25 referring to Tr. 225). Finally, the ALJ noted that "in the remote past" plaintiff engaged in substantial gainful activity.[2] (Tr. 25). The ALJ concluded that "as a whole, the record . . . indicates the [plaintiff] has no deficits in adaptive functioning." Id.

The ALJ did not dispute that, although plaintiff said she can pay attention "all the time", she also said that she does not follow written or spoken instructions well. (Tr. 225). While plaintiff said she can read, she also said that she does

---

[2] According to defendant's brief, plaintiff worked at the substantial gainful employment level in 1994. Doc. No. 12 at p. 11. Since then, it appears that plaintiff has worked part-time.

not comprehend what she is reading.  (Tr. 224).  The ALJ did not dispute that plaintiff cannot make change; that she cannot manage a checking or savings account without confusion; that plaintiff has someone assist her when she shops to keep track of how much she spends; or that plaintiff has lived alone for only two months in her lifetime.   The ALJ appeared to give "significant weight" to the conclusions of Dr. Mintz, who stated that plaintiff "appears able to understand only very simple . . . instructions"; that her concentration capacity "appears limited for very repetitive tasks"; that plaintiff "does not appear capable of handling her own funds"; and that plaintiff has "difficulty with self direction and self help and vocational functioning."  (Tr. 29, 347).

It is important to be mindful that the "Listing requirement is not no adaptive functioning but deficits in adaptive functioning."  Hendricks v. Astrue, 2009 WL 648610 *7 (S.D.Ind. 3/11/2009).   The court holds that a reasonable review of the record shows that plaintiff has demonstrated deficits in some aspects of adaptive functioning, but not in other aspects of adaptive functioning.  The record shows that in the areas of shopping, paying bills, and managing personal finances that plaintiff has deficits in adaptive functioning.  The record also shows that plaintiff has deficits in comprehension and concentration which would reasonably impact her adaptive

functioning.   Thus, while she may follow along with a TV show and perform simple cooking, cleaning and laundry, she has some deficits in adaptive functioning.[3]   The ALJ's conclusion to the contrary is not supported by substantial evidence.   See McKown v. Shalala, 1993 WL 335788 *2 (10th Cir. 8/26/1993)(self-care and interpersonal cooperation not inconsistent with § 12.05C impairment); Davis, 2015 WL 3504984 at *6 (watching TV, playing cards and video games not inconsistent with § 12.05C impairment); Whitehead v. Commissioner of SSA, 2014 WL 3952839 *5 (W.D.Tenn. 8/13/2014)(watching TV, driving, caring for a young child, tending to personal hygiene are not inconsistent with § 12.05C impairment); Gross, 2012 WL 2449900 at *7-10 (claimant's previous unskilled work, cooking, laundry, shopping and household chores do not prevent finding of § 12.05C impairment).

          4.   The record supports a finding that plaintiff's impairment was present prior to age 22.

     The next part of the court's analysis considers whether plaintiff's intellectual disability and deficits in adaptive functioning were present prior to age 22.   The ALJ does not dispute that plaintiff participated in special education from third grade through senior year.   In his decision, the ALJ does

---

[3] In the court's opinion, the conclusory remark - - "no learning barriers present" - - from an emergency room nurse who did not perform a documented mental examination of plaintiff, does not provide substantial evidence that plaintiff has no deficits in adaptive functioning.

not mention, but also does not dispute, plaintiff's testimony
that she spent most of her school day in special education
classes.[4] The ALJ did remark that no records have been submitted
into evidence to document the level of special education
provided, but he did not dispute the credibility of plaintiff's
testimony on the subject.[5] It is noteworthy that there is no
evidence that any event took place after age 22 or any process
culminated after age 22 which led to plaintiff's intellectual
disability and adaptive functioning deficits.

Upon this record, it would be unreasonable to conclude that
plaintiff failed to sustain her burden of proving that her
intellectual disability and adaptive functioning deficits were
present prior to age 22. As plaintiff's counsel has stated,
several circuit courts and cases from the District of Kansas
have held that IQ test scores and a history of special education
are sufficient, absent evidence indicating a cause after the age
of 22, to satisfy the early manifestation requirement of §
12.05C; indeed some cases require only the IQ scores. See
Talavera, 697 F.3d at 152 (IQ scores); Maresh v. Barnhart, 438
F.3d 897, 900 (8th Cir. 2006)(a person's IQ is presumed to remain
stable over time in the absence of any evidence of a change in

---

[4] Plaintiff also told Dr. Mintz that she graduated from high school in special
education. (Tr. 346).
[5] Defendant's counsel notes that plaintiff stated on a form that she did not
participate in special education classes. See Tr. 215. The ALJ, however,
did not attempt to support his conclusions with this statement.

intellectual function); <u>Hodges v. Barnhart</u>, 276 F.3d 1265, 1268-69 (11th Cir. 2006)(IQ test after age 22 creates rebuttable presumption of onset prior to age 22); <u>Bradley</u>, 2012 WL 5878612 at *3 (employing assumption that IQ scores remain relatively constant throughout life); <u>Gross</u>, 2012 WL 2449900 at *11 (evidence of special education classes, IQ score, and mental retardation diagnosis is evidence supporting inference of onset prior to age 22); <u>Soverns v. Astrue</u>, 501 F.Supp.2d 1311, 1321 (D.Kan. 2007)(employing assumption that IQ scores remain relatively constant throughout life); <u>Fox v. Barnhart</u>, 2007 WL 1063198 *6 (D.Kan. 4/2/2007)(IQ test after age 22 creates rebuttable presumption of onset prior to age 22); see also <u>Luckey v. U.S. Dept. of Health & Human Servs.</u>, 890 F.2d 666, 668 (4th Cir. 1989)(the absence of an IQ test during the developmental years does not preclude a finding of mental disability predating age 22); <u>Guzman v. Bowen</u>, 801 F.2d 273, 275 (7th Cir. 1986)(a court may assume that IQ test taken after insured period reflects IQ during the insured period).

V.   THE COURT SHALL REVERSE AND REMAND FOR AN AWARD OF BENEFITS.

If a claimant can show at step three that his or her impairments are equivalent to one of the listed impairments contained in the social security regulations, the claimant is presumed to be disabled and entitled to benefits. <u>Lax</u>, 489 F.3d at 1085. The court believes it is clear that plaintiff has made

that showing and that no useful purpose would be served by remanding this matter for further administrative proceedings. Since clear and uncontradicted evidence in the record indicates that plaintiff is entitled to an award of benefits in accordance with § 12.05C, the court shall remand for an immediate award of benefits.[6]  See Salazar v. Barnhart, 468 F.3d 615, 626 (10th Cir. 2006)(directing an award of benefits when it appears that a remand for additional fact finding and a correct application of the law would serve no useful purpose).

VI.  CONCLUSION

For the above-stated reasons, pursuant to sentence four of 42 U.S.C. § 405(g), the court shall reverse and remand the decision to deny benefits in this case.  The court directs that on remand plaintiff's applications for benefits be granted and that the amount of payments be determined by the defendant.

**IT IS SO ORDERED.**

Dated this 29th day of July, 2015, at Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

_____

[6] For this reason as well, the court shall not address plaintiff's other arguments to reverse the decision to deny benefits.